IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MATTHEW CLAYTON MORROW,

    Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

    Defendant.

No. C 18-04641 WHA

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In this social security appeal, plaintiff appeals the denial of disability benefits. For the reasons stated below, plaintiff's motion for summary judgment is **DENIED**, and defendant's cross-motion for summary judgment is **GRANTED**.

**STATEMENT**

**1. PROCEDURAL HISTORY.**

In November 2011, plaintiff (and claimant) Matthew Clayton Morrow applied for disability insurance benefits under Title II of the Social Security Act. The plaintiff alleged disability from full time work beginning on March 7, 2011, when, as a deputy sheriff, he suffered a head injury following an altercation with an inmate at Monterey County Jail. The claim was initially denied in August 2012, then denied again after reconsideration in August 2013 (AR 189–99, 300–01).

The plaintiff then requested a hearing before an Administrative Law Judge (ALJ). In June 2014, the plaintiff appeared without representation before ALJ Brenton Rogozen and testified about his disability. In February 2015, the ALJ issued a partially favorable decision finding that the plaintiff had a physical impairment that met the criteria for Listing 11.18 (traumatic brain injury) and was temporarily disabled from March 7, 2011 until December 1, 2012 (AR 38–86, 160–75). The plaintiff appealed the decision to the Appeals Council, and in May 2016, the Appeals Council released an order that vacated the ALJ decision and remanded the case to further evaluate the plaintiff's impairment level, residual functional capacity, and relevant vocational factors. The Appeals Council also questioned the "favorable" parts of the hearing decision and whether the plaintiff "met or medically equaled Listing 11.18 during the period of disability" (AR 184–88, 257–59).

In November 2016, the plaintiff appeared with his attorney and testified again before the ALJ. In April 2017, the ALJ issued his second decision in which the plaintiff was found *not* to be disabled from the onset date, March 7, 2011, through the date last insured, December 31, 2012. The decision found that the severity of the plaintiff's physical impairments did *not* meet or medically equal Listing 11.18 and the plaintiff's mental impairment did *not* meet or medically equal the criteria of Listings 12.02 (neurocognitive disorders) or 12.04 (depressive, bipolar, and related disorders). The decision concluded that the plaintiff had the residual functional capacity to perform sedentary work, limited to simple, repetitive tasks with occasional public contact, and was capable of making a successful adjustment to other work that existed in significant numbers in the national economy (AR 11–37, 87–114). In May 2017, the plaintiff appealed the ALJ's decision again and the Appeals Council denied the request for review, thus rendering the ALJ decision in April 2017 the Commissioner's final decision (AR 2–7, 298–99). The plaintiff then initiated this action seeking judicial review pursuant to Section 405(g) of Title 42 of the United States Code. The parties now cross-move for summary judgment.

### 2. PLAINTIFF TESTIMONY.

The plaintiff testified in both hearings before the ALJ, submitted multiple disability and function reports, and met with many medical examiners. The plaintiff's written submissions and subjective testimonial complaints both alleged that his head injury made him incapable of working. The plaintiff alleged that due to his head injury, he suffered from headaches, nerve damage, dizziness, nausea, vomiting, blurred vision, sensitivity to noise and motion, memory loss, vertigo, fatigue, anxiety, impulsive behavior, and depression. He also claimed to have difficulty remembering things, like when he last showered or took medication, when bills were due, and to finish chores. He testified that he had become less social and had difficulty communicating with his wife and children, often becoming irritable and easily frustrated. Furthermore, the plaintiff claimed to have difficulty completing complex tasks, becoming overwhelmed when faced with multiple tasks, finding it hard to concentrate around distractions, and becoming easily fatigued (AR 38–114, 344–55, 376–83, 402–15, 418–26, 473–80, 542–43). The plaintiff's spouse, Brandy Morrow, offered similar testimony in support (AR 67–68, 107–13, 356–63, 427–35, 545–46).

### 3. MEDICAL EVIDENCE.

The ALJ summarized and weighed all the medical evidence he considered in his decision. This order will briefly summarize some of the relevant medical evidence from the expansive record.

The plaintiff underwent a large number of clinical and laboratory diagnostic tests, most of which returned unremarkable results. The plaintiff had computerized tomography (CT) and magnetic resonance imaging (MRI) scans taken of his head in 2011, but the results showed no abnormalities (AR 739–53). The results of an electroencephalography (EEG) in 2011 were also unremarkable (AR 720–21). Neurological and physical examinations also turned out normal, and ophthalmological examinations revealed "[n]o obvious ocular component" that could be causing the alleged blurred vision (AR 659). Audiology exams showed "hearing within normal limits bilaterally" and no indication of hyperacusis (AR 735). Videonystagmography, however,

revealed evidence of significant peripheral and central vestibular dysfunction and balance rehabilitation was recommended (AR 723–24).

The administrative record also contains opinions from several different medical examiners that the plaintiff visited. A set of medical opinions were from sources linked to a workers' compensation action and found the plaintiff to be temporarily totally disabled or 100% permanently disabled (AR 667–75, 783–806, 820–72, 1250–60). One of those examiners was treating physician Maureen Miner, M.D., who first examined the plaintiff in September 1, 2011 and continued to treat him until at least August 1, 2016 (AR 689–743, 1272–79). Dr. Miner's residual functional capacity questionnaire concluded that the plaintiff had "permanent disability," needed unscheduled breaks "multiple times" a day for "minutes to hours," and would be unable to work or complete a day of work more than four days per month (AR 1272–75).

The record also contains the medical opinions of several other treating physicians. Carlo Bernardino, M.D., the plaintiff's treating ophthalmologist, indicated that the plaintiff could return to full duty in July 2011 with no restrictions or limitations (AR 653–66). Ronald Diebel, M.D., a treating psychiatrist, and David O. Torrez, Ph.D., MFT, a treating therapist, both indicated that the plaintiff exhibited "three or more episodes of decompensation within 12 months, each at least two weeks along" and that they expected the plaintiff to be absent or unable to complete a work day more than four days a month (AR 1238–49). Both, however, began treating the plaintiff after the date last insured.

The opinions of consultative examiners and impartial medical experts were also considered. Jeanne Card, Psy.D., a consultative psychological examiner, saw the plaintiff in May 2013 and opined that he "appeared cognitively intact" and was "able to perform simple and repetitive tasks" with "no significant maladaptive behaviors" (AR 1043–48). Kim Goldman, Psy.D., another consultative psychological examiner, saw the plaintiff in July 2012 and opined that he had moderate difficulties in maintaining social function; moderate to marked difficulties with concentration, persistence, and pace; and an ability to carry out and remember simple instructions (AR 815–19). Claude Munday, Ph.D., a neurophysical examiner,

4

saw the plaintiff in November 2012 and opined that it was "a very interesting case," as the plaintiff described "major functional limitations" yet was "remarkably adept when it [came] to the actual testing" and only showed "very mild" residual cognitive deficits (AR 867). Manuel Hernandez, M.D., an internal medicine consultative examiner, saw the plaintiff in 2016 and opined that he was capable of work at the light exertional level (AR 1261–71). James Haynes, M.D., the impartial medical expert at the plaintiff's first ALJ hearing, stated that the plaintiff had no exertional or postural limitations (AR 54). Ashok Khushalani, M.D., another impartial medical expert at the first hearing, found that the plaintiff was limited to simple, repetitive tasks with occasional public contact (AR 65–67).

**ANALYSIS**

A decision denying disability benefits must be upheld if it is supported by substantial evidence and free of legal error. *See Stout v. Comm'r, Soc. Sec. Admin.,* 454 F.3d 1050, 1052 (9th Cir. 2006). "Substantial evidence means more than a scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). Federal courts must "consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Ibid.* "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities," so when "the evidence can reasonably support either affirming or reversing a decision, [a court] may not substitute [its] judgment for that of the [ALJ]." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (citing *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

There is a five-step evaluation for determining disability. 20 C.F.R. § 404.1520. *First*, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. *Second*, the ALJ evaluates whether the claimant has a medically severe impairment or combination of impairments. *Third*, the ALJ considers whether the impairment or combination of impairments meets or equals any listed impairment in the regulations. *Fourth*, the ALJ

5

assesses whether the claimant is capable of performing his past relevant work based on his residual functional capacity. *Fifth*, the ALJ examines whether the claimant can perform any other jobs in the national economy. "The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five." *Colvin*, 759 F.3d at 1011.

Here, the ALJ determined that the plaintiff did not engage in substantial gainful activity during the period from his alleged onset date, March 7, 2011, through his date last insured, December 31, 2012. He then determined that the plaintiff had post traumatic brain injury, depression, and vertigo through the date last insured. At step three, the ALJ found that the impairment or combination of impairments did not meet or equal any listed impairment in the regulations. The ALJ then determined that the plaintiff had the residual functional capacity to perform sedentary work that was limited to simple, repetitive tasks with occasional public contact, but that plaintiff was unable to perform any past relevant work. Finally, the ALJ concluded that plaintiff was not disabled because there were jobs that existed in significant numbers in the national economy that the plaintiff could have performed (AR 17–28).

Plaintiff attacks the ALJ's decision in five ways. *First*, plaintiff asserts that ALJ Rogozen was not properly appointed, so his decision should be vacated and a new hearing commenced under a properly appointed ALJ. *Second*, plaintiff argues that the ALJ erred in discounting his testimony. *Third*, plaintiff asserts that the testimony of his treating physicians, Dr. Miner and Dr. Diebel, should have been given more weight. *Fourth*, plaintiff asserts that the ALJ's decision at step three of the five-step evaluation process was not supported by substantial evidence. *Fifth*, plaintiff attacks the partial weight and little weight assigned to the opinions of two consultative psychologists, Dr. Goldman and Dr. Card. This order will address each argument in turn.

1. **IMPROPER APPOINTMENT.**

As a threshold matter, plaintiff asserts that ALJ Rogozen was not properly appointed under the Appointments Clause in Article II of the Constitution. This argument is premised on a recent decision by the Supreme Court, *Lucia v. Securities and Exchange Commission*, 585 U.S. ––––, 138 S. Ct. 2044, 2053–2055 (2018), which found that ALJs of the SEC are

6

"Officers of the United States" that can only be appointed by the President, "Courts of Law," or "Heads of Departments." *Lucia* found that ALJs of the SEC were "Officers" because they hold "continuing" positions where they exercised "significant authority pursuant to the laws of the United States." *Id.* at 2051. *Lucia* also held that the appropriate remedy to a *timely* challenge "before the Commission" was a new hearing before a different ALJ that was properly appointed. *Id.* at 2055.

Plaintiff, however, has failed to make a timely challenge or factually establish that ALJ Rogozen was improperly appointed. *Lucia* only found that ALJs of the SEC were "Officers of the United States" and were improperly appointed by SEC staff members. While it is possible that ALJs of the Social Security Administration are similarly in continuing positions that "exercise significant authority pursuant to the laws of the United States," plaintiff has failed to support the argument besides legal conclusions. Furthermore, plaintiff has failed to provide any factual evidence supporting the theory that ALJ Rogozen specifically was improperly appointed. Indeed, it is plausible that ALJ Rogozen was properly appointed by an appropriate Head of Department.

*Lucia* also only provides a remedy for *timely* challenges that were made during the administrative process. Plaintiff does not dispute that he failed to preserve his objection in front of ALJ Rogozen or the Appeals Council. While our court of appeals has not directly spoken on the issue of preserving challenges under *Lucia* in the social security context, it has recently confirmed the general proposition that a social security claimant must exhaust issues before the ALJ to preserve judicial review. *Shaibi v. Berryhill*, 883 F.3d 1102, 1109 (9th Cir. 2017). In addition, nearly all district courts that have faced this issue have declined to remand when the Appointments Clause challenge was not exhausted during the administrative process. *See Sprouse v. Berryhill*, 363 F. Supp. 3d 543, 548–49 (D.N.J. 2019) (collecting cases). Thus, plaintiff's Appointments Clause challenge falls short.

### 2. PLAINTIFF TESTIMONY.

Plaintiff asserts that the ALJ improperly discounted his testimony about the severity of his symptoms. There is a two-step analysis to determine whether a plaintiff's testimony

7

regarding subjective pain or symptoms is credible: "First, the ALJ must determine whether the [plaintiff] has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter*, 504 F.3d at 1036 (9th Cir. 2007). "Second, if the [plaintiff] meets this first test, and there is no evidence of malingering, the ALJ can reject the [plaintiff's] testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Ibid*.

The ALJ properly rejected parts of the plaintiff's testimony when it was inconsistent with the overall medical evidence. At step one, the ALJ determined that the plaintiff suffered a mild traumatic brain injury that could reasonably be expected to cause the alleged symptoms. At step two, the ALJ gave specific, clear and convincing reasons when discounting the plaintiff's statements about the intensity, persistence, and limiting effects of the symptoms. The ALJ discounted the allegation of nerve damage because it was "inconsistent with the numerous normal physical and neurological findings." The ALJ discounted the allegation of blurred vision because "ophthalmological tests were normal." The allegation of sensitivity to noise were discounted because audiology tests "showed no evidence of hyperacusis." In contrast, the allegation of vertigo was accepted because it was supported by videonystagmography (AR 21–22). The ALJ also stated that he "generously" considered the plaintiff's allegations of fatigue with mental and physical tasks because of the "subjective nature" of many of the symptoms like headaches, dizziness, nausea, and light sensitivity (AR 22).

The plaintiff also alleged a host of mental impairments that were functionally limiting. The plaintiff alleged he had difficulty remembering things, such as when he last showered, when to pay bills, and to finish chores. The severity of this allegation was discounted based on psychological consultive examinations where the "plaintiff demonstrated memory in the average range" and was able to recall personal data and complete multiple questionnaires independently and appropriately. The ALJ also noted that the plaintiff was able to follow instructions without the need for clarification or repetition. The plaintiff also alleged that he had difficulty communicating with his wife and children, easily losing patience with them.

The ALJ discounted the severity of this allegation based on doctors' observations that the plaintiff was pleasant, cooperative, and displayed no maladaptive behaviors (AR 18).

The plaintiff alleged difficulty multitasking and concentrating for over ten minutes in the face of distractions. The ALJ discounted the severity of this allegation based on the fact that plaintiff was capable of completing a twelve-page questionnaire and a history form independently and appropriately. The ALJ further noted that in psychological consultative evaluations, the plaintiff "demonstrated fair attention to instructions, fair task persistence, ability to perform math calculations, and ability to perform a three-step command." The ALJ also added that the plaintiff's alleged disabling functional limitations were inconsistent with the plaintiff's reported activities, such as preparing simple meals, washing dishes, doing laundry, driving his children to activities, mowing the lawn, going to church, taking care of pets, and going shopping in stores (AR 18–22). In sum, the ALJ properly provided a specific, clear and convincing reason each time he discounted the severity of plaintiff's testimony.

### 3. TREATING PHYSICIANS.

Plaintiff asserts that the ALJ gave inadequate weight to two of plaintiff's treating physicians: Dr. Miner and Dr. Diebel. Our court of appeals has distinguished between three types of physicians: treating, examining, and nonexamining. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, the "opinions of treating doctors should be given more weight than the opinion of doctors who do not treat the [plaintiff]." When a treating doctor's opinion is contradicted by another doctor, the ALJ may reject the opinion but must provide "specific and legitimate reasons" for doing so "supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of a treating physician." *Lester*, 81 F.3d at 831.

Here, plaintiff asserts that the ALJ improperly gave Dr. Miner's opinion little weight. Dr. Miner concluded that the plaintiff was permanently disabled and would need unscheduled work breaks, lasting possibly hours, multiple times a day and would be unable to complete a workday more than four times a month (AR 1274–75). The ALJ gave little weight to

9

Dr. Miner's opinion because "it [was] conclusory and inadequately supported by the objective medical evidence."

This order finds that the ALJ's decision to give Dr. Miner's opinion little weight is supported by substantial evidence. While Dr. Miner treated the plaintiff extensively during the relevant period, and for several years after, it was unclear from her reports how she ultimately arrived at her conclusions (AR 710–17, 1272–79). The progress reports showed Dr. Miner ordering multiple tests, like CT scans, EEGs, audiograms, and videonystagmography, while reporting plaintiff's testimony of ongoing headaches and nausea (AR 713–16). The record, however, indicated that the objective tests returned relatively unremarkable results. It is then unclear how Dr. Miner reached her conclusion that the plaintiff would needs hours of unscheduled breaks a day and that he would unable to finish the workday more than four days a month. Furthermore, Dr. Miner's conclusion of permanent disability was in the context of a workers' compensation claim, which applies a different standard for a finding of "disability" than in the social security context. *See* 42 U.S.C. § 423(d).

Plaintiff also asserts that the ALJ improperly assigned little weight to the opinion of treating psychiatrist Dr. Diebel. The ALJ asserted that Dr. Diebel "did not examine the [plaintiff] until several months after the relevant period," so his "opinions are not an accurate reflection of the severity of [plaintiff's] mental impairment during the relevant period" (AR 25). Dr. Diebel provided his medical opinion on June 20, 2016, stating that he first began treating the plaintiff on April 29, 2013 (AR 1238–1243). Since the plaintiff's relevant period ended on December 31, 2012, Dr. Diebel first saw the plaintiff nearly half a year after the end of the relevant period and provided his opinion nearly three years after. It is also unclear how Dr. Diebel's opinion applies retroactively because when asked to "indicate the earliest date when the signs, symptoms, and limitations . . . first applied to this case," Dr. Diebel, in an apparent mistake, answered with a date in the future: June, 30, 2019. Dr. Diebel's prognosis was simply "fair," yet he opined that the patient suffers from "three or more episodes of decompensation within 12 months, each at least two weeks long" and that the plaintiff would be absent from work or unable to complete a work day more than four days a month (AR 1238,

10

1243). As this conclusory opinion contradicts the battery of normal test results and given the delayed time of examination, this order finds that the ALJ was supported by substantial evidence in assigning little weight to Dr. Diebel's opinion.

### 4. STEP THREE FINDINGS.

Plaintiff asserts that the ALJ made an error when completing step three of the five-step evaluation for disability. Plaintiff attacks the determination that he did not meet the requirements for Listing 11.18 by arguing that the ALJ should have relied on the testimony of Dr. Haynes, the impartial medical expert from the first hearing. This is an odd line of argument as the Appeals Council vacated the initial ALJ decision for mistakenly relying on Dr. Haynes' testimony (AR 185–86). And indeed, Dr. Haynes' testimony stated that the plaintiff's head injury was "not all that severe" and that he thought the plaintiff did *not* meet the 11.18 Listing for traumatic brain injury (AR 52). Reliance on Dr. Haynes' testimony would only further support the ALJ's determination. Nonetheless, the ALJ did not rely on Dr. Haynes' testimony for the Listing 11.18 determination, instead stating that "no treating or examining physician has recorded findings equivalent in severity to the criteria of any listed impairment" (AR 17). Thus, the finding that plaintiff did not meet the requirements for Listing 11.18 is supported by substantial evidence.

Plaintiff also attacks the finding that he did not meet the requirements for Listing 12.02 or 12.04 during the relevant period. Again, plaintiff launches an odd attack on the testimony of Dr. Khushalani, claiming that her opinions are invalid in light of new Listings criteria that took effect in 2017. Plaintiff, however, fails to provide any support for the proposition that modified Listings criteria should be retroactively applied to already completed determinations. Furthermore, plaintiff misreads the ALJ's opinion. The ALJ did *not* rely on Dr. Khushalani's testimony from the first ALJ hearing in making a determination at step three. Instead, the ALJ relied on the plaintiff's testimony and examination findings in concluding that plaintiff did not meet the "paragraph B" or "paragraph C" criteria. As each "paragraph B" and "paragraph C" determination was supported by extensive evidence in the record, the finding that plaintiff did

not meet the requirements for Listing 12.02 or 12.04 was also supported by substantial evidence.

### 5. CONSULTATIVE PSYCHOLOGISTS.

Plaintiff asserts that the ALJ's decision gave inadequate weight to the assessments of consultative psychologists Dr. Goldman and Dr. Card. Plaintiff asserts that the ALJ was required to give clear and convincing reasons for disregarding aspects of a consultative medical examiner's opinion. Our court of appeals, however, stated that it employs a clear and convincing standard when an ALJ rejects the *uncontradicted* opinion of a medical source. *Popa v. Berryhill*, 872 F.3d 901, 906 (9th Cir. 2017). In this instance, however, both consultative psychologist opinions were contradicted by the opinions of Dr. Khushalani and state agency medical consultants (AR 65–67, 128–30, 153–58).

The decision to give the opinion of Dr. Card little weight is supported by substantial evidence. The ALJ consistently gave little weight to all medical examiners who did not first examine the plaintiff until after the date last insured. Dr. Card did not first examine the plaintiff until May 18, 2013, five months after his date last insured, so her testimony was less applicable. Furthermore, Dr. Card opined that the plaintiff was "able to perform simple and repetitive tasks" and that "[plaintiff] should be able to work with coworkers" (AR 1047). Thus, giving Dr. Card's testimony increased weight would only support the determined residual functional capacity.

As for Dr. Goldman, the ALJ appropriately only gave partial weight to Dr. Goldman's opinions. The ALJ adopted Dr. Goldman's opinion on social limitations and limitation to simple instructions, but declined to adopt Dr. Goldman's opinion of marked limitation in concentrating, persisting, and pace. The ALJ instead chose to rely on a contradictory neuropsychological examination by Dr. Munday. Dr. Munday found "very subtle and circumscribed deficits" and stated that he saw "a very clean picture of someone with some very mild residuals secondary to a mild traumatic brain injury or concussion" (AR 867). Dr. Munday then narrowed in on a central issue in this appeal: "While [the plaintiff] describes

12

major functional limitations, he is remarkably adept when it comes to the actual testing" (AR 867). The ALJ's assignment of partial weight to Dr. Goldman's opinion was supported by substantial evidence as there was contradictory, convincing medical evidence that was more harmonious with the overall record.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is **DENIED**, and defendant's motion for summary judgment is **GRANTED**. Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Dated: May 7, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE